532 S.E.2d 661

Clay FOODLAND, Petitioner Below, Defendant,

v.

STATE of West Virginia ex rel. WV DE-PARTMENT OF HEALTH AND HU-MAN RESOURCES, BUREAU OF PUB-LIC HEALTH/WOMEN, INFANT AND CHILDREN'S (WIC) SUPPLEMENTAL FOOD PROGRAM, Respondent Below, Appellee.

No. 26731.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 16, 2000.

Decided June 12, 2000.

Dissenting Opinion of Justice Scott June 22, 2000.

David D. Molgaard, Esq., Charleston, West Virginia, Attorney for Defendant.

Darrell V. McGraw, Jr., Esq., Attorney General, Dennise Smith, Esq., Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

MAYNARD, Chief Justice:

Clay Foodland appeals the March 24, 1999 order entered by the Circuit Court of Kanawha County, West Virginia, which upheld the Department of Health and Human Resources' hearing examiner's decision to assess thirty sanction points against the vendor for an overcharge violation. Clay Foodland was thereby disqualified from participating in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) for two years. The vendor contends the violation arose from employee theft, and the store should, therefore, not be sanctioned. We agree and reverse.

Clay Foodland is an authorized food vendor which participates in the WIC program, a supplemental nutrition program for women, infants, and children. WIC is a program of the United States Department of Agriculture which was authorized by the Child Nutrition Act of 1966. 42 U.S.C. § 1786 (1966). "The purpose of the Program is to provide supplemental foods and nutrition education through payment of cash grants to State agencies which administer the Program through local agencies at no cost to eligible persons." 7 C.F.R. § 246.1 (1998). In West Virginia, the local agency which administers the program is the Department of Health and Human Resources (DHHR), and the food is distributed through a retail purchase system. The vendors are retail grocery stores.

Participants in the program visit WIC clinics where medical personnel determine individual nutritional needs. Based on those needs, participants receive food vouchers or drafts which specify the kind and quantity of food which may be purchased and the maximum amount which may be charged for each item. The vouchers are then tendered by participants to authorized vendors to pay for food items. The vendors redeem the vouchers by presenting them to a banking agent for processing.

Any grocery store in the state may apply to become a vendor. In order to become authorized to accept the vouchers, a store must complete an application packet, pass a preliminary on-site screening, complete training in WIC policies and procedures, and enter into a contract with WIC through DHHR. Each contract is issued for a two-year period. The federal regulations specify the terms of the contract. Among other requirements, the contract specifies that the vendor must provide food "at the current price or at less than the current price charged to other customers" and that the vendor is "accountable for actions of employees in the utilization of food instruments or

provision of supplemental foods." 7 C.F.R. 246.12(f)(2)(ii) and (ix) (1998).

Federal regulations also require the state agency to monitor vendors for compliance and to establish policies which determine the type and level of sanctions that will be applied against food vendors for compliance violations. 7 C.F.R. § 246.12(k) (1998) states in pertinent part:

(k). *Participant and vendor sanctions.*

(1) The State agency shall establish policies which determine the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program violations observed, and such other factors as the State agency determines appropriate, such as whether the violation represented repeated offenses over a period of time, whether the offenses represented vendor policy or whether they represented the actions of an individual employee who did not understand Program rules, and whether prior warning and an opportunity for correction was provided to the vendor. Vendor offenses which are subject to sanctions shall include at least the following: Providing cash, unauthorized foods or other items to participants in lieu of authorized supplemental foods; charging the State or local agency for foods not received by the participant; and charging the State or local agency more for supplemental foods than other customers are charged for the same food item.

The regulations further state that "[t]he period of disqualification from Program participation shall be a reasonable period of time, not to exceed three years. The maximum period of disqualification shall be imposed only for serious or repeated Program abuse." 7 C.F.R. § 246.12(k)(1)(ii) (1998). A factor which must be taken into consideration before a vendor is disqualified from the Program is "whether the disqualification would create undue hardships for participants." 7 C.F.R. § 246.12(k)(1)(v) (1998).

WIC's vendor handbook contains the sanction policy which is incorporated into vendor contracts. The sanction policy sets forth the rules vendors must follow and the sanction points that will be assessed for violations.

As points accumulate, the following sanctions are imposed:

| | |
|---|---|
| 5 points: | warning letter |
| 10 points: | warning letter and mandatory training |
| 20 points: | warning letter and further mandatory training |
| 30 points: | disqualification from the program for two years or until the project area is due for reauthorization, whichever is greater. |

An overcharge violation occurs when a vendor charges a WIC participant more for supplemental foods than the vendor charges other customers. This is considered to be one of the most severe violations, and is, consequently, assessed a penalty of thirty sanction points which results in automatic disqualification from the program for two years.

Each month, WIC's banking agent collects a random sampling of redeemed food drafts which is forwarded to WIC for review. While reviewing a random sampling of food drafts redeemed by Clay Foodland, WIC personnel noted that sixteen of the seventeen vouchers had been altered upward. As this was unusual, WIC personnel suspected the store was overcharging the program. In order to test its suspicions, WIC decided to conduct a compliance buy.

On July 29, 1996, a WIC employee posed as a WIC participant and bought food with a food voucher. No violations were observed at the time of purchase. The cashier correctly wrote the sale amount on the food draft and, on the back of the draft, accurately indicated the quantity and price of the items purchased. The actual sale totaled $19.33. However, a compliance buy is not complete until the vendor redeems the food voucher and the voucher makes its way through the banking system. When this particular food voucher returned to WIC, the total sale price was inflated to $27.69. The information on the back of the voucher had obviously and meticulously been altered to reflect the changed sale amount. The following price changes were made: one-half gallon of milk purchased for $1.40 was changed to $1.50, two gallons of milk purchased for $2.19 per gallon was changed to $2.49 per gallon, a can of juice purchased for $1.69 was changed to

$1.89, and a twenty-eight ounce box of cereal purchased for $3.29 was changed to three twelve-ounce boxes for $3.45 per box.

After receiving the altered food voucher, WIC sent Clay Foodland a notice charging the store with Violation I, an overcharge, which carries an assessment of thirty sanction points and results in disqualification for two years. Accordingly, the notice informed Clay Foodland that the store was disqualified from the WIC program for two years.

Upon receiving a copy of the altered voucher, the store could readily see the prices had been changed but did not immediately determine that a violation had occurred. The agency handbook provides that an error in recording a price may be corrected by drawing a line through the incorrect price and entering the correct price above it. Store management retrieved and reviewed the cash register tape and drawer balances for the cashier involved in the compliance buy. The store ultimately discovered the cashier had masked a theft of $10.00 by increasing the value of the voucher by $8.36 and leaving the difference to be reflected on the register tape as a shortage of $1.74 for the day. The investigation additionally revealed the cashier was also manipulating other internal store recording procedures unrelated to the WIC program to mask a larger pattern and practice of theft from her drawer. When confronted, the employee did not contest management's conclusion that she altered the voucher to conceal theft. The cashier's employment with the store was ultimately terminated.

Clay Foodland contested the disqualification from the WIC program by initiating the appeal procedure. The store's owner met with DHHR in a prehearing conference and subsequently appeared at the administrative hearing. Among other findings, the hearing examiner found that Clay Foodland had been a WIC vendor for approximately twenty years, and that, in order to become authorized, the store had attended vendor authorization training and signed a contract with the WIC program; the WIC Vendor Handbook states that vendors are accountable for the actions of employees in the use of food instruments; upon receiving a copy of the voucher from WIC, the store could not determine upon its face that it had been improperly altered, however, a comparison of the journal tape with the voucher revealed an inflated price; when confronted, the cashier offered no explanation; and that upon further investigation, the store discovered the cashier was stealing money and masking her theft by falsifying vouchers and creating fraudulent "paid out" vouchers. Most importantly to the case at bar, the hearing examiner found that "[w]hen WIC assesses sanction points against vendors, it does not look at the circumstances surrounding the violations on a case-by-case basis."

The hearing examiner then determined that "[Clay Foodland] made no showing that [the] disqualification was inconsistent with federal regulations, the vendor contract or any agency policy." As a result, the store was deemed disqualified from September 1, 1997 until August 31, 1999. The disqualification was stayed pending appeal to circuit court. On appeal, the circuit court adopted the hearing examiner's findings of fact and conclusions of law and affirmed the disqualification. The circuit court's order was stayed pending appeal to this Court.

On appeal, Clay Foodland alleges the circuit court erred in affirming the hearing examiner's decision. Clay Foodland argues that the record as a whole does not support a finding that the store is guilty of an overcharge violation; that DHHR's sanction policy as drafted and administered is inconsistent with federal regulations; that DHHR failed to consider whether the disqualification would create undue hardship for participants; and that the terms of the WIC contract are void or voidable as unconscionable, terms of an adhesion contract, or against public policy. The question we must answer is whether DHHR may properly sanction a vendor who participates in the WIC program for an overcharge violation when the overcharge occurs by employee theft. In other words, we must determine if it is fair to sanction the vendor when he or she did nothing wrong.

The federal regulations give DHHR authority to set "the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program

violations observed[.]" Other factors may be taken into consideration as DHHR deems appropriate. The State agency may consider "whether the violation represented repeated offenses over a period of time, whether the offenses represented vendor policy or whether they represented the actions of an individual employee who did not understand Program rules, and whether prior warning and an opportunity for correction was provided to the vendor." Certain offenses must be sanctioned, including "[p]roviding cash, unauthorized foods or other items to participants in lieu of authorized supplemental foods; charging ... for foods not received by the participant; and charging the ... agency more for supplemental foods than other customers are charged for the same food item." 7 C.F.R. § 246.12(k) (1998).

■ We are dealing here with an overcharge violation; however, the context of this particular overcharge was not envisioned by the federal regulations or the agency guidelines. We are dealing with employee theft. The vendor, as well as the WIC program, is a victim in this scenario. DHHR's hearing examiner found the overcharge was caused by employee theft but nonetheless determined that "[t]he actions of this employee were carried out within her scope of employment even though those actions were not to the benefit of her employer[.]" Clay Foodland contends the cashier was not acting within her scope of employment when she altered the food voucher to mask the fact that she was stealing from the vendor's cash register. We agree.

The term "scope of employment" is discussed in 12B M.J. *Master and Servant* § 99 (1992) as follows:

"Scope of employment" is a relative term and requires a consideration of surrounding circumstances, including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act.

In general terms, it may be said that an act is within the course of the employment, if: (1) It is something fairly and naturally incident to the business and (2) it is done while the servant was engaged upon the master's business and is done, although

mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account.

Employee theft is certainly not naturally incident to the owner's business and even though the act was done while the cashier was engaged in the owner's business, the theft was not done with a view to further the owner's interests. The theft arose from a personal motive on the part of the cashier to further her own interests. Under these circumstances, the employee's theft from the WIC program simply does not fit within her scope of employment.

■ DHHR chose not to consider the nature of the violation, choosing rather to simply determine that an overcharge occurred. The federal regulations at 7 C.F.R. § 246.12(k)(1) (1998) require that DHHR sanction according to the "severity and nature" of the observed violation. When asked if he considered the possibility of employee theft, Jesse Moore, the vendor monitor for the West Virginia WIC program, testified before the hearing officer by stating, "It's not a concern that it's an employee theft." When asked if he considered the nature and severity of the violation as it relates to employee theft, the vendor monitor answered, "It matters to me, sir, that the WIC Program got overcharged." DHHR justifies this position by emphasizing that neither the vendor contract nor the sanction policy distinguishes between an intentional and an unintentional overcharge. Nobody questions that the overcharge in this case was intentional. The point is that the vendor was not cognizant of, nor did the store reap any benefit from, the overcharge. The agency also chose not to provide notice and an opportunity for correction even though, according to the regulations, it could have done so. Upon proper consideration of the nature of this overcharge violation, we do not believe the vendor should be held liable for the cashier's theft.

Clay Foodland argues that DHHR's policy, which considers only whether WIC was overcharged, ignores the requirement that vendors be given an opportunity to correct or justify an overcharge pursuant to 7 C.F.R. 246.12(r)(5)(iii) (1998). This regulation reads as follows:

(5) The State agency shall establish procedures to ensure the propriety of redeemed food instruments.

(iii) When payment for a food instrument is denied or delayed, or a claim for reimbursement is assessed, the affected food vendor shall have an opportunity to correct or justify the overcharge or error. For example, if the actual price is missing, the vendor may demonstrate what price should have been included. If the State agency is satisfied with the correction or justification, then it shall provide payment, or adjust the payment or claim to the vendor accordingly.

DHHR argues, and we agree, that the agency is required to give the vendor the opportunity to correct or justify an overcharge or an error in only three situations, that is, when payment is denied, when payment is delayed, and when a claim for reimbursement is assessed. In the case at bar, Clay Foodland redeemed the food draft for payment and WIC paid the redeemed food draft. Accordingly, this section does not apply.

We find no merit in Clay Foodland's argument that the store's disqualification will cause undue hardship for participants. During oral argument before this Court, it was determined that another grocery store is located within two miles of this vendor and other stores are located within a five-to-ten mile radius. In fact, the closest store is located one-fourth of a mile from this vendor.

■ We understand that within certain guidelines the type and level of sanctions to be applied against food vendors is discretionary with DHHR. We also understand that discretion requires fairness. Black's Law Dictionary 467 (6th ed.1990) defines "discretion" as follows:

When applied to public functionaries, discretion means a power or right conferred upon them by law of acting officially in certain circumstances, according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others. As applied to public officers connotes action taken in light of reason as applied to all facts and with view to rights of all parties to action while having regard for what is right and equitable under all circumstances and law.

The New York Supreme Court discussed "discretion" as it applies to public officers in *Calzaretta v. Mulrain,* 131 N.Y.S.2d 76, 79 (1954). We quote with approval from that case:

There is an abuse of discretion by public officials where the power or right to act in an official capacity is unreasonably exercised. Discretion as applied to public officers means power or right to act in an official capacity in a manner which appears to be just and proper under the circumstances. (Citations omitted).

We do not believe it is just and proper to take away Clay Foodland's right to participate in the WIC program for two years due to an overcharge violation which resulted from employee theft from which the store profited nothing. We further note the store states it had previously participated in the WIC program for twenty years without being cited for one single infraction. In this case, the violation was not a repeated offense, the offense did not represent vendor policy or actions by an employee who did not understand program rules, neither was a prior warning and opportunity for correction provided. It is simply not fair to sanction someone who has done nothing wrong. We, therefore, hold that DHHR may not sanction a WIC vendor for an overcharge violation when the overcharge occurs as a result of employee theft if the vendor was not cognizant of the employee's actions and did not participate in or profit from the theft.

Accordingly, we reverse the judgment of the Circuit Court of Kanawha County which upheld the agency's decision to disqualify Clay Foodland from the WIC program for two years and remand for an order consistent with this opinion.

Reversed and remanded.

**398**

SCOTT, Justice, dissenting:

(Filed June 22, 2000)

In its fervor to achieve a "fair" result, the majority has intervened inappropriately in an administrative matter and created a rule of law[1] which is not only contrary to the controlling regulatory and contractual provisions, but detrimental to the very women, infants, and children for whose benefit the WIC Program exists. For these reasons, I dissent.

The federal regulations which govern the operation of the West Virginia WIC Program, as they existed at the time of Clay Foodland's overcharge violation, provide: "The State agency shall establish policies which determine the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program violations observed, and such other factors as the State agency determines appropriate...." 7 C.F.R. § 246.12(k)(1) (1996). The regulations mandate that "[v]endor offenses which are subject to sanctions shall include ... charging the State or local agency more for supplemental foods than other customers are charged for the same food item." *Id.* With respect to the length of a vendor's disqualification, the regulations state: "The period of disqualification from Program participation shall be a reasonable period of time, not to exceed three years. The maximum period of disqualification shall be imposed only for serious or repeated Program abuse." 7 C.F.R. § 246.12(k)(1)(ii).

As required by the federal regulations, DHHR has promulgated a sanction policy, which is incorporated into the West Virginia Code of State Rules and the vendor contracts of the West Virginia WIC Program and which identifies various vendor offenses with corresponding sanction point values. *See* 64 C.S.R. 55. Under DHHR's policy, a vendor who commits an "overcharge" violation, by charging the WIC Program more for supplemental foods than other customers are charged for the same food item, is penalized

with an assessment of thirty sanctions points and automatic disqualification from the WIC Program for two years.

Additionally, in compliance with federal law, the West Virginia WIC Program's food vendor contracts contain specifications to the effect that "[t]he food vendor shall provide supplemental foods at the current price or at less than the current price charged to other customers," "[t]he food vendor shall be accountable for actions of employees in the utilization of food instruments," and "[t]he State agency may disqualify a food vendor for reasons of Program abuse." 7 C.F.R. § 246.12(f)(2)(ii), (ix), (xviii).

In this case, it is undisputed that Clay Foodland's cashier fraudulently altered a food voucher which the store then redeemed by presenting it to a banking agent for processing. Clay Foodland's redemption of a food voucher with an inflated sale price constitutes a textbook case of an overcharge violation subject to mandatory sanction under federal law. *See* 7 C.F.R. § 246.12(k)(1). In accordance with the federal regulations, DHHR's policy, and the vendor contract, Clay Foodland was charged with an overcharge violation, assessed thirty sanction points, and disqualified from the West Virginia WIC Program for two years, less than the three-year maximum period of disqualification allowed under federal law. *See* 7 C.F.R. § 246.12(k)(1)(ii). Clearly, Clay Foodland's disqualification comported with the applicable regulatory and contractual provisions and was properly upheld by the circuit court.

While acknowledging the relevant law and contractual provisions, the majority nonetheless elects to frame the issue in exceedingly broad, equitable terms: whether "it is fair to sanction the vendor when he or she did nothing wrong." Only by loosely stating the issue, without regard to the controlling law or any deference to DHHR, is the majority able to conclude that it is not "just and proper to take away Clay Foodland's right to participate in the WIC program for two

---

1. I am referring to syllabus point two of the majority opinion, which states that DHHR "may not sanction a vendor who participates in the ... [WIC] Program ... for an overcharge violation

when the overcharge occurs as a result of employee theft if the vendor was not cognizant of the employee's actions and did not participate in or profit from the theft."

years." I disapprove of the majority's approach. As stated in *Russell's Old Trading Post, Inc. v. United States ex rel. United States Department of Agriculture*, 783 F.Supp. 395 (N.D.Ind.1992), where the federal district court denied a retail grocery store's motion for a preliminary injunction preventing its withdrawal from the Food Stamp Program:

> [I]t is not for this court to pass judgment on the wisdom of the actions taken against this grocery store and its owners. . . .

> Under our system of administrative law and judicial review of administrative decisions, the initial policy decision to act must be left with the state and federal bureaucracies. As the statutes and regulations in question are constitutional, it is only in a very narrow and precise way that those who disagree with the administrative agency's decision can be successful in challenging such decisions in either state or federal courts. For this court to change or modify the actions taken against Russell's would constitute the kind of judicial activism that this court and others of like mind have long abhorred.

*Id.* at 397. Like the court in *Russell's*, the majority should have declined to interfere with DHHR's administration of the WIC Program since DHHR's decision to disqualify Clay Foodland was well within the parameters of the federal regulations and consistent with DHHR's sanction policy and the vendor contract terms.

My dissatisfaction with the majority opinion is heightened by my realization that in holding that a WIC vendor may not be sanctioned for an overcharge violation resulting from employee theft, the majority has articulated a rule with negative implications for the underprivileged beneficiaries of the West Virginia WIC Program. "Every dollar which a vendor improperly claims in WIC reimbursement is a dollar less available for the . . . WIC Program to pay for actual food products for the women, infants, and children who need them." *Barakat v. Wisconsin Dep't of Health and Soc. Servs.*, 191 Wis.2d 769, 530 N.W.2d 392, 398 (Ct.App.1995). In its quest for "fairness," the majority has focused exclusively on a perceived injustice to Clay Foodland, losing sight of what should have been its main concern—the effect of Clay Foodland's violations on the WIC Program and its participants. Contrary to the tenor of the majority opinion, Clay Foodland was not totally innocent. If its employee had been properly supervised, this incident would not have occurred. Even if this were a court of equity sitting in review, we could not properly reach the result found by the majority because Clay Foodland would have to be held to have violated that ancient principle which forbids relief to one who comes into court with unclean hands.

Accordingly, I respectfully dissent.